IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHAQUILLE PARKER, #275050    )
    )
    Plaintiff,    )
    )
    v.    )    CASE NO. 2:15-cv-340-MHT
    )    [WO]
JEFFERSON S. DUNN, *et al.*,    )
    )
    Defendants.    )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION

Plaintiff Shaquille Parker, an inmate of the Alabama Department of Corrections, filed this action under 42 U.S.C. § 1983, raising the following claims:

(i) The defendants violated his due process rights by relying on an offense committed during his incarceration in the Madison County Jail as a basis for the close custody determination; (ii) The classification hearing did not comport with minimal due process; (iii) He was denied due process during his confinement in close custody at Kilby Correctional Facility, a term of confinement which lasted over a year, because he did not receive periodic reviews of his close custody status during this time; (iv) The conditions in close custody, i.e., one hour out-of-cell time while handcuffed and shackled, visitation only once every six months, use of phone only once every 90 days, commissary visits one time per month, no television privileges, inadequate ventilation and heat, lack of required living space (80 square feet), no chair or stool in the cell, lack of emergency button and absence of a fire sprinkler, violated his Eighth Amendment rights; and (v) The differential treatment of inmates assigned to close custody from general population inmates is violative of equal protection.

Doc. 44 at 1–2 (footnote omitted).[1] Plaintiff names as defendants Jefferson Dunn, Phyllis Billups, Timothy Logan, and Michelle Ellington ("Defendants").[2] Doc. 1. Plaintiff requests compensatory damages. Doc. 44 at 1 n.1.

Defendants filed an answer, special report, supplemental special report, and evidentiary materials addressing Plaintiff's claims for relief. Docs. 23, 24, 42 & 48. Upon receipt of Defendants' reports, the court directed Plaintiff to file a response, including sworn affidavits and other evidentiary materials, and specifically cautioning Plaintiff that "at some time in the future the court may treat the defendants' report[s] and the plaintiff's response[s] as a dispositive motion and response." Docs. 25 & 35. Plaintiff responded to Defendants' reports and materials. Docs. 26, 43 & 50.

The court now will treat Defendants' reports as a motion for summary judgment. Upon consideration of the motion, responses, and evidentiary materials filed in support and in opposition to the motion, the court concludes that the motion for summary judgment is due to be granted.

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

---

[1] The court ruled that "[t]his case shall henceforth proceed on the claims presented by the plaintiff in the amended complaint." Doc. 44 at 1 (footnote omitted). The court directed Defendants to respond to the claims that the court identified as set forth in the amended complaint and listed in the court's order. Docs. 18 & 44.

[2] The court previously dismissed Defendants Angela Dawson and "Central Records." Docs. 1, 9 & 14.

if any, show there is no [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating that there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24.

Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to Plaintiff to establish with appropriate evidence beyond the pleadings that a genuine dispute material to the case exists. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (holding that court may consider facts pleaded in a plaintiff's sworn complaint when considering his opposition to summary judgment"). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-

finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); Fed. R. Civ. P. 56(e). But a "mere 'scintilla' of evidence supporting the opposing party's position will not suffice." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Only disputes involving material facts are relevant, and what is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. . . . . '[c]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'") (citation omitted). "Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*,

115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (holding that conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact). Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the court, a *pro se* litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's *pro se* status alone does not mandate that this court disregard elementary principles of production and proof in a civil case. Here, Plaintiff fails to demonstrate a genuine dispute of material fact so as to preclude summary judgment on his claims. *See Matsushita*, 475 U.S. at 587.

### III. SUMMARY OF MATERIAL FACTS

The court views the facts in the light most favorable to Plaintiff, the nonmoving party. During the time relevant to the complaint, Plaintiff was an inmate at the Kilby Correctional Facility ("Kilby").[3] Defendant Dunn was the Alabama Department of Corrections ("ADOC") Commissioner, and the other defendants were employed by the ADOC at Kilby. Billups was a warden, and Defendants Logan and Ellington were Captains. Doc. 24 at 1.

Plaintiff arrived at Kilby from the Madison County Jail ("the jail") on October 17, 2014, to serve a life sentence for robbery and burglary. Doc. 42-2 at 1. At the time, Plaintiff also had charges pending against him for assaulting a correctional officer at the jail on

---

[3] Plaintiff is now incarcerated at St. Clair Correctional Facility. Doc. 50.

August 23, 2014. Docs. 42-11 at 5 & 48-1 at 1–2. In 2015, Plaintiff was convicted and

sentenced to ten years in prison for the assault at the jail. Doc. 48-1 at 2.

On October 24, 2014, Plaintiff received a "24 Hour Advance Notification of

Pending Reclassification." Doc. 48-1 at 7. The notice advised Plaintiff that on

October 27, 2014 he would meet with a reclassification team to be moved to close custody

because of the jail assault:

> While in Madison County jail on 8/23/2014, Inmate Parker assaulted a
> correctional officer by striking the correctional officer in the head numerous
> times causing injury (cuts and contusions to head). At the time of assault it
> is believed that Parker was armed with a blunt object which was used during
> the attack. Assault II DC 14-5509 is pending as a result of this attack. In
> keeping with Classification guidelines a custody increase up to Close is being
> recommended.

Doc. 48-1 at 7. Plaintiff signed an acknowledgement of the notice and the opportunity to

call witnesses on his behalf, and he waived his right to 24-hour notice. Doc. 48-1 at 7.

The written "Due Process Hearing Minutes" from the classification hearing on

October 24, 2014 indicate that Plaintiff was informed that the jail assault was the basis for

recommending a reclassification to close custody, and the evidence in support of the

classification included the assault charges. Doc. 48-1 at 14. Plaintiff was allowed to make

a statement on his behalf and ask questions. He asserted that he had not been convicted of

anything and that punishing him for the incident at the jail was "like double jeopardy."[4]

Doc. 48-1 at 14. He also asked why he had to stay in lockup for such a long time. Doc. 48-

1 at 14. Plaintiff signed a form to acknowledge that he was advised of the decision for him

---

[4] This court dismissed Plaintiff's double jeopardy claim based on the assault. Docs. 9 & 14.

to be placed in close custody. Doc. 48-1 at 14. Plaintiff asserts that he was told that he would remain in close custody for one year. Doc. 1 at 4.

A written "Classification Summary," signed by Plaintiff and Alicia White, the Classification Specialist who represented the state at the hearing, repeats the justification for recommending close custody. Doc. 48-1 at 8. Six days later, Angela Lawson approved the summary on behalf of the Central Review Board "due to assaulting officer in county jail." Doc. 48-1 at 8.

While in close custody, Classification Specialist White, on behalf of the Institutional Segregation Review Board, issued memoranda relating to concerns of inmates in segregation. Doc. 48-3. The memoranda indicate that White answered Plaintiff's concerns on five dates during his close custody. Doc. 48-3 at 1–6. On December 23, 2014, Plaintiff asked about his hearing date. Doc. 48-3 at 1. On April 29, 2015, Plaintiff asked for a copy of his "PR." Doc. 48-3 at 3. On May 6, 2015, Plaintiff again asked for a copy of his PR. Doc. 48-3 at 4. On September 9, 2015, Plaintiff asked for his review date. Doc. 48-3 at 5. And on September 16, 2015, Plaintiff asked about his classification status. Doc. 48-3 at 6.

Plaintiff's classification was reviewed on September 9, 2015, and Plaintiff signed an acknowledgment form indicating that he was recommended for level V, medium custody. Doc. 48-1 at 12. The Central Review Board suggested no change in his custody on September 11, 2015, which was approved on September 17, 2015. Docs. 48-1 at 12–13 & 42-1 at 25–26. Plaintiff remained in close custody until December 18, 2015, when he was moved to level V, medium custody. Doc. 42-1 at 7–8 & 33. He then was transferred to St. Clair Correctional Facility. Doc. 48-1 at 2.

When Plaintiff entered Kilby, he received a medical and mental health screening. Doc. 24-4 at 3–5. He reported a history of counseling. Doc. 24-4 at 8. In an October 29, 2014 psychological evaluation update, Plaintiff was diagnosed with antisocial personality disorder but no medication was recommended. Doc. 24-4 at 10. Plaintiff's health was regularly monitored until March 26, 2015, and in April 2015 he was "outgated" for a court referral and returned on April 16, 2015. Docs. 24 at 3 & 24-4 at 11–13. Plaintiff asked for mental health help on April 19, 2015 because of audio/visual hallucinations. Doc. 24-5 at 1 & 7. A psychiatrist examined Plaintiff on April 27, 2015. Doc. 24-5 at 4–5 & 8. Plaintiff was seen again for counseling on May 4, 2015, and staff planned to monitor him and provide him with six months of education and counseling, but he was encouraged to report to them if symptoms became intrusive. Doc. 24-5 at 9–10. Plaintiff saw the psychiatrist again on June 22, 2015, and he "present[ed] with a[n] elated mood, affect bright, and goal directed. Inmate mood was congruent with his affect." Doc. 24-5 at 12. Plaintiff denied psychotic symptoms, and staff indicated that the plan would be to continue his behavioral treatment and education without psychotropic medication. Doc. 24-5 at 12.

The cells in close custody are eight feet by five feet, and include a toilet, sink, bed, and writing table. Doc. 48-2 at 1. Inmates may exercise for one hour each Monday through Friday, weather permitting, and they are "handcuffed/shackled." Doc. 48-2 at 1. The cells do not have emergency buttons or sprinklers, and officers are to conduct security checks every 30 minutes. Doc. 48-2 at 2. Inmates with medical or mental health emergencies can request to speak to an officer or turn in a sick call form. Doc. 48-2 at 2. Inmates needing immediate medical or mental help are escorted to the Health Care Unit or Mental Health

Unit to see a counselor. Doc. 48-2 at 2. The Institutional Housing Review Board conducts rounds of the unit once per week. The Review Board includes a Warden, Captain, Classification Supervisor, Mental Health Counselor, Psychological Associate, and Chaplain. Doc. 48-2 at 2. A Lieutenant, two Sergeants, and several officers work in the restrictive housing area, and the officers have access to supervisors if an inmate needs immediate help. Doc. 48-2 at 2. Mental health counselors see inmates who are on their assigned caseload and inmates who make requests. Doc. 48-2 at 2. Pill call occurs three times per day. Doc. 48-2 at 2. Inmates in restrictive housing have visitation every six months, are allowed to use the phone every 90 days, and have access to the commissary once per month. They do not have television privileges. Doc. 48-2 at 2. Ice call is every two hours, except on extremely hot days, when it is every hour. Doc. 48-2 at 2. Inmates in restrictive housing also have access to oscillating fans and drinking water. Doc. 48-2 at 2. They shower and shave every other day. Doc. 24-3 at 1. Billups, Logan, and Ellington each aver that at no time did Plaintiff inform them that he had any complaints while in segregation. Docs. 24-1 at 2, 24-2 at 2 & 24-3 at 2.

Plaintiff maintains that while in close custody he had to exercise with his hands cuffed behind him. Docs. 18 at 3 & 50 at 3.[5] Other inmates in segregation submitted sworn statements indicating that inmates had to exercise with their hands behind their backs and

---

[5] Plaintiff's statements are not sworn under penalty of perjury. "Unsworn statements 'do[] not meet the requirements of Fed. Rule Civ. Proc. 56(e)' and cannot be considered by a district court in ruling on a summary judgment motion." *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970)). Under Rules 56(e)(2) and (4), however, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed" or "issue any other appropriate order." For purposes of this Recommendation, the court treats Plaintiff's statement as undisputed.

legs shackled, the cells were hot, there were no water sprinklers or emergency buttons, the only time they saw officers was during feeding and pill time, and rats and cockroaches crawled through the cells at all times during the day and night. Doc. 50 at 9–10.

Plaintiff asserts that, unlike inmates in close custody, inmates in general population receive visitation twice per month, daily phone privileges, commissary once per week, are free to talk with one another, and can watch television. Doc. 26 at 2–3. Plaintiff asserts that the conditions in close custody caused him emotional distress and failed to meet federal standards as set out in *Rights of Prisoners*, fourth edition, appendix B—namely, that cells have 80 square feet of floor space as well as a chair or stool, emergency button, and fire sprinkler. Doc. 26 at 4–5. Plaintiff further alleges that around September 2015 he became deeply depressed, was placed in a padded cell for suicidal inmates, saw a mental health doctor, and was placed on medication for depression. Doc. 43 at 2.

## IV. DISCUSSION

Defendants argue that Plaintiff has no standing to bring his claims because he fails to show that he suffered any harm from their alleged unconstitutional acts, that they cannot be held liable based on a theory of *respondeat superior*, that they are entitled to absolute immunity from any claims against them in their official capacities,[6] that they are entitled to qualified immunity from Plaintiff's claims against in their individual capacities for money damages, that Plaintiff makes only conclusory allegations, and that Plaintiff alleges nothing more than *de minimis* physical injuries and therefore the Prison Litigation Reform

---

[6] Plaintiff states that he is not suing Defendants in their official capacities. Doc. 26 at 6. Consequently, the court need not address Defendants' argument asserting absolute immunity.

Act, 42 U.S.C. § 1997e(e) bars his request for damages. Docs. 24 at 5–13 & 48 at 6. Defendants further argue that Plaintiff has no right to have the classification specialist ignore his prior assault on correctional staff, that he received all required due process at his classification hearing, that he received periodic segregation reviews, that his conditions of confinement did not violate the Eighth Amendment, and that they did not violate his equal protection rights. Doc. 48 at 7–17.

## A.      Qualified Immunity Standard

Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (quotation marks and citations omitted). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that Defendants were acting within the course and scope of their discretionary authority when the incidents complained of occurred. Plaintiff must, therefore, allege facts that, when read in a light most favorable to him, show that Defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotation marks and citations omitted). A right is "clearly established" when (1) "a materially similar case has already been decided," (2) there is "a broader, clearly established principle that should control the novel facts of the situation," or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208–09 (11th Cir. 2017) (quotation marks and citations omitted). The second and third ways to show clearly established law are known as "obvious clarity" cases, and they are rare. *Id.* at 1209; *see also Vinyard v. Wilson*, 311 F.3d 1340, 1350–51 (11th Cir. 2002) (explaining that, in the third situation, "the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful"; and in the second situation, if there is a case "determining that 'X Conduct' is unconstitutional *without tying* that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle") (footnote omitted). The controlling case law is from "the United States Supreme Court, the Eleventh Circuit, or the highest court in the relevant state." *See Gaines*, 871 F.3d at 1209. "Qualified immunity gives government officials

12

breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). The Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines*, 871 F.3d at 1210 (quotation marks and citation omitted). "Exact factual identity with the previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). If the plaintiff cannot establish both elements to satisfy his burden, a defendant is entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241–42).

**B.   Due Process**

Plaintiff asserts that Defendants violated his due process rights by relying on an offense committed during his incarceration in the Madison County Jail as a basis for the close custody determination, that the classification hearing did not comport with minimal due process, and that he was denied due process during his 14 months of close custody because he did not receive periodic reviews of his custody status. Doc. 44 at 1–2. Defendants argue that Plaintiff did not have a right to have the classification staff ignore his prior assault on a correctional officer. Doc. 48 at 7–8. Defendants also argue that, assuming Plaintiff had a protected liberty interest at his classification hearing, he received adequate due process. Doc. 48 at 9–11. Defendants further argue that Plaintiff did, in fact,

receive periodic segregation reviews. Doc. 48 at 11–12.

The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. When a person asserts the deprivation of liberty without due process, the court first determines whether a protected liberty interest is at stake. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). If an interest giving rise to procedural protections is at stake, the court determines whether the process employed was adequate to protect that interest. To determine what process is due, the court applies a three-part framework based on *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), that balances (1) the private interest affected, (2) the risk of erroneous deprivation and value of additional or substitute safeguards, and (3) the government's interest. *Wilkinson*, 545 U.S. at 224–25.

Plaintiff does not have a right to be housed at any particular custody level or classification. *See Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (holding that the Constitution does not confer any right upon an inmate to any particular custody or security classification); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose."). Consequently, Plaintiff had no protected interest in avoiding close custody simply because his classification was based on an assault of an officer while he was housed at a different facility. Nevertheless, in two circumstances a prisoner can be further deprived of his liberty such that due process is required:

> The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. The second is when the state has consistently given a certain benefit to prisoners

> (for instance, via statute or administrative policy), and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." In the first situation, the liberty interest exists apart from the state; in the second situation, the liberty interest is created by the state.

*Bass v. Perrin*, 170 F.3d 1312, 1318 (11th Cir. 1999) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (other citations omitted). There has been no argument that the conditions of close custody exceed Plaintiff's sentence and thus only the second circumstance is at issue in Plaintiff's case. "After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson*, 545 U.S. at 222–23 (quoting *Sandin*, 515 U.S. at 484).

Defendants assume that Plaintiff had a protected liberty interest in avoiding close custody at Kilby. Doc. 48 at 9–10. This assumption is consistent with Eleventh Circuit law.[7] But even assuming Plaintiff's close custody was an atypical and significant hardship

---

[7] The conditions Plaintiff experienced for 14 months in close custody were more restrictive than those in the general prison population. They were somewhat factually similar to those held to create a liberty interest in *Wilkinson*, although the placement in *Wilkinson* was indefinite, and Plaintiff's was for 14 months; the placement in *Wilkinson* was reviewed annually (after review within 30 days of arrival), whereas Plaintiff's custody was reviewed 11 months later; and unlike the plaintiff in *Wilkinson*, Plaintiff does not state that he was excluded from parole consideration. *Wilkinson*, 545 U.S. at 217 & 223–24; Docs. 48-1 & 48-3. Long before Plaintiff's classification, the Eleventh Circuit assumed more restrictive conditions that included a year of solitary confinement imposed an atypical and significant hardship in relation to the ordinary incidents of prison life. *See Williams v. Fountain*, 77 F.3d 372, 374 n.3 (11th Cir. 1996) ("Because Williams's sanctions—especially the full year of solitary confinement—represent substantially more 'atypical and significant hardship[s] . . . in relation to the ordinary incidents of prison life,' we assume that he suffered a liberty deprivation and was entitled to due process."). More recently, the Court of Appeals agreed that an inmate asserted an atypical and significant hardship where he was held in solitary confinement for more than two years in a stripped-down cell with virtually no personal property, no exercise, little outside mail, only one visit and one phone call per month, less food than inmates in general population, no access to commissary or utensils, and unsanitary conditions. *Quintanilla v. Bryson*, 2018 WL 1640140, at *1, *4 (11th Cir. Apr. 5, 2018) (unpublished) (per curiam).

in relation to the ordinary incidents of prison life sufficient to create a liberty interest triggering due process protection, an analysis of the three *Matthews* factors leads to the conclusion that Defendants are entitled to qualified immunity on the question of whether Plaintiff received the process due to him.

The first *Mathews* factor—Plaintiff's private interest in being free from erroneous placement in close custody—weighs in favor of additional protections but "must be evaluated, nonetheless, within the context of the prison system and its attendant curtailment of liberties." *Wilkinson*, 545 U.S. at 225 (addressing the first *Mathews* factor). Under the second factor, the procedures in place and probable value of additional or alternative safeguards adequately addressed the risk of Plaintiff's erroneous placement in close custody because Plaintiff received advanced written notice of the classification hearing, an opportunity to call witnesses on his behalf and to ask questions, a written statement by the hearing officer listing the reasons for the classification and describing the evidence on which the officer relied, and a written summary of the classification decision. Doc. 48-1 at 7–8 & 14. "[N]otice of the factual basis leading to consideration for [maximum security prison] placement and a fair opportunity for rebuttal . . . are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *See Wilkinson*, 545 U.S. at 225–26 (addressing the second *Mathews* factor) (citations omitted). Third, the government's interest in the prison context "is a dominant consideration." *Wilkinson*, 545 U.S. at 227. Prison officials' "first obligation" must be to ensure safety at the institution, *see id.*, and Plaintiff does not dispute that he, in fact, assaulted a jail officer before his transfer to Kilby. Based on a balancing of the *Mathews* factors under existing precedent,

the decision to place Plaintiff in close custody satisfied due process requirements. *See id.* at 228–29; *see also Superintendent v. Hill*, 472 U.S. 445, 454 (1985) (holding procedural due process is satisfied where there is "some evidence" in the record to support a finding of guilt of a disciplinary violation).

Defendants suggest that after the initial close custody classification, the Segregation Review Board gave "consideration" to Plaintiff on five occasions during weekly rounds in close custody. Doc. 48 at 5 & 11–12. The "consideration" identified in the record is the Classification Specialist's response to Plaintiff's administrative questions relating to issues such as his hearing dates and status. Doc. 48-3. This was not a periodic substantive review of Plaintiff's classification level or security risk of the sort contemplated in *Wilkinson*, where the assignment to a maximum security prison for an indefinite period of time was subject to appeal, reviewed after 30 days, and then reviewed at least annually using the same criteria as the initial placement. *Wilkinson*, 545 U.S. at 217. Nevertheless, the nearly annual review in Plaintiff's case was close to that approved in *Wilkinson*. *See id.* at 226–27 (describing the levels of review, including inmate's opportunity to object prior to final level of review, and review of placement within 30 days of initial placement). More importantly, to overcome Defendants' qualified immunity defense, it is Plaintiff's burden to show that in 2014 it was clearly established law in this circuit that Defendants' procedures to safeguard Plaintiff's interest in not being assigned to and kept in close custody violated the Due Process Clause. *Gaines*, 871 F.3d at 1208 (holding that plaintiff must show that a defendant had "fair warning" that the act was unconstitutional). Plaintiff points to no binding precedent in which a classification decision, process, or review similar

17

to the one in Plaintiff's case was declared unconstitutional. Accordingly, Defendants are entitled to qualified immunity on Plaintiff's due process claim.

## C.   Equal Protection

Plaintiff argues that inmates assigned to close custody are treated differently than general population inmates in violation of the Equal Protection Clause. Doc. 44 at 2. The Equal Protection Clause of the Fourteenth Amendment generally requires states to treat all similarly situated persons alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). When, as here, an inmate is not part of an otherwise identifiable group receiving additional protections under the Equal Protection Clause, the person can bring a claim as a "class of one" and the court will consider whether the state action is rationally related to a legitimate government purpose. *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009); *cf. Ellison v. Ala. Bd. of Pardons & Paroles*, 2017 WL 6947946, at *6 (11th Cir. Dec. 13, 2017) ("Because sex offenders are not considered a suspect class, and parole is not a fundamental right, [plaintiff] would need to show that there is no rational basis for the Board to impose a stricter parole requirement on sex offenders[.]") (citations omitted). To state a claim of equal protection as a "class of one," a plaintiff must allege that (1) he is similarly situated to (2) "comparators [who are] prima facie identical in all relevant respects," and that (3) defendants have intentionally treated him differently (4) without any rational basis. *See Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006). To be similarly situated, the comparators must be prima facie identical in all relevant respects. *Grider v. City of Auburn*, 618 F.3d 1240, 1264 (11th Cir. 2010). The Court of Appeals has stated that "establishing a 'class of one' equal

protection claim can be an onerous task." *Leib*, 558 F.3d at 1307.

Plaintiff's history of assault prevents him from being similarly situated to inmates with no such history who were allowed into the general inmate population. Plaintiff's equal protection claim therefore necessarily fails because he has not identified any similarly situated inmates. *See Sweet v. Dept. of Corr.*, 467 F.3d 1311, 1319 (11th Cir. 2006). And, even assuming Plaintiff was treated differently than similarly situated inmates, the basis for placing him in a more secure setting was rationally related to the legitimate government purpose of maintaining safety at the institution. *See Leib*, 558 F.3d at 1306. Finally, Plaintiff points to no materially similar case establishing a violation in Plaintiff's circumstances, and the other methods to provide fair warning to a defendant do not apply here. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1209 (11th Cir. 2007) (holding that the language in the Equal Protection Clause "may, as it does here, simply operate at too high a level of generality" to make prior case law unnecessary, and that the broad legal principles in "class of one" cases were inapplicable because "the precise facts of a case are critical in evaluating a 'class of one' claim"). Consequently, Defendants are entitled to qualified immunity from Plaintiff's equal protection claim, and summary judgment is due to be granted in their favor.

## D.    Eighth Amendment

Plaintiff argues that the conditions in close custody violated his Eight Amendment rights. He describes the conditions as "one hour out-of-cell time while handcuffed and shackled, visitation only once every six months, use of phone only once every 90 days, commissary visits one time per month, no television privileges, inadequate ventilation and

heat, lack of required living space (80 square feet), no chair or stool in the cell, lack of emergency button and absence of a fire sprinkler." Doc. 44 at 2. The Eighth Amendment protects convicted prisoners from "unnecessary and wanton infliction of pain" that is "totally without penological justification." *Hope*, 536 U.S. at 737 (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)) (quotation marks omitted). An Eighth Amendment claim includes an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To show the objective component, "the deprivation alleged must be, objectively, sufficiently serious." *Id.* "[T]he inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes*, 452 U.S. at 347. "The Constitution does not mandate comfortable prisons," but it imposes certain restraints on prison officials and requires that prison officials "provide humane conditions of confinement," "ensure that inmates receive adequate food, clothing, shelter, and medical care, and take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (quotation marks and citations omitted).

In evaluating an Eighth Amendment claim, the court must consider both the severity and the duration of a prisoner's exposure to a condition. *See Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir. 2004) (considering an inmate's exposure to extreme temperatures). The living conditions within a correctional facility will constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting

imprisonment." *Rhodes*, 452 U.S. at 347 "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency. . . . But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id.* at 347. To determine whether conditions of confinement constitute cruel and unusual punishment, the court must look to the effect the condition has upon the inmate. *Id.* at 366. In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards. *Hamm v. DeKalb Cnty.*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986); *see also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991). The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme Court's admonishment that:

> *Some* conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. . . . To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as "overall conditions" can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.

*Wilson v. Seiter*, 501 U.S. 294, 304–05 (1991).

As to the subjective component, the "state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 832 (citation omitted). Deliberate indifference means "the official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 837–38; *see also Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("[P]roof that the defendant should have perceived the risk, but did not, is insufficient."). "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Wilson*, 501 U.S. at 305 (holding that "mere negligence" does not constitute deliberate indifference).

Consistent with these precepts, the court concludes that summary judgment is due to be granted in favor of Defendants on Plaintiff's claimed Eighth Amendment violation. Plaintiff does not dispute that he received ice and fans, and he provides no evidence regarding the temperature in his cell. Albeit not under the conditions he preferred, Plaintiff admits that he had the opportunity to exercise, and the evidence does not suggest that he

22

complained to Defendants or that they knew he suffered pain from shackles or unsanitary

conditions.[8] On the other hand, Plaintiff received mental health treatment while at Kilby,

and his nearly total isolation "poses a substantial risk of psychological harm and

decompensation, and . . . this risk is especially heightened for prisoners suffering from

mental illness." *United States v. McNeal*, 2018 WL 3023092, at *2 (M.D. Ala. June 18,

2018) (citing *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1236–38 (M.D. Ala. 2017)). But the

evidence does not suggest that Defendants had any knowledge that Plaintiff was suffering

physically or mentally[9] as a result of the conditions in close custody. As stated above,

Defendants' lack of knowledge of a risk, even of a substantial risk, is a bar to Plaintiff's

claims. *Farmer*, 511 U.S. 837–38 ("An official's failure to alleviate a significant risk that

he should have perceived but did not, while no cause for condemnation, cannot under our

cases be condemned as the infliction of punishment."). The record is devoid of evidence

showing that the named Defendants were aware of inhumane or unsafe conditions and that

---

[8] The court agrees with Defendants that they cannot be held liable simply based on their supervisory positions. Doc. 24 at 6–7. Liability for actions of correctional officials attach to a supervisory defendant only if he or she "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [the supervisor's] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360. Furthermore, "[i]n light of the Court's determination that there was no constitutional deprivation, there is no basis for supervisor liability." *Nam Dang v. Sheriff, Seminole Cnty. Fla.*, 871 F.3d 1272, 1283 (11th Cir. 2017).

[9] As Defendants point out, *see* Doc. 24 at 13, Plaintiff cannot receive compensatory damages without a prior showing of physical injury. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)."). Nominal damages, however, "'are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages.'" *Williams v. Brown*, 347 F. App'x 429, 436 (11th Cir. 2009) (quoting *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003)); *see also Brooks v. Warden*, 800 F.3d 1295, 1307–08 (11th Cir. 2015) (holding that nothing in § 1997e(e) prevents a prisoner from recovering nominal damages for a constitutional violation without a showing of physical injury); *Hughes*, 350 F.3d at 1162 ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages.").

they recklessly or deliberately disregarded them. The record regarding the conditions in close custody at Kilby does not create a genuine issue as to whether Defendants denied Plaintiff the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Rhodes*, 452 U.S. at 347; *see also Farmer*, 511 U.S. at 838; *cf. Brooks v. Warden*, 800 F.3d 1295, 1305 (11th Cir. 2015) (discussing circumstances that deny adequate sanitation and hygiene requirements for inmates). Furthermore, Plaintiff fails to meet his burden to demonstrate that it was clearly established in 2014 that Defendants violated his Eighth Amendment rights. *Gaines*, 871 F.3d at 1208–09. Defendants are therefore entitled to qualified immunity on Plaintiff's Eighth Amendment claim against them.

## V. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.     Defendants' motion for summary judgment be GRANTED.

2.     Judgment be ENTERED in favor of Defendants.

3.     This case be DISMISSED with prejudice.

4.     The costs of this proceeding be taxed against Plaintiff.

It is further ORDERED that on or before **August 20, 2018,** the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 6th day of August, 2018.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE